## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION


**JOHN E. WATKINS,**

      **Plaintiff,**

**vs.**                                    **Case No. 4:12cv215-RH/CAS**

**JULIE JONES,[1]**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

      Pending in this case is Defendant Julie Jones' motion for summary judgment, doc. 76, and pro se Plaintiff John E. Watkins' amended motion for summary judgment, doc. 84.  Secretary Jones' motion is supported by Exhibits A through L, doc. 77, with two of those exhibits having been re-filed.  Doc. 80.[2]  Mr. Watkins' motion is also supported by Exhibits A (doc. 84 at 21) through L (doc. 84 at 68).  Mr. Watkins filed a response in opposition to Secretary Jones' motion, doc. 85, but Secretary Jones did not file a response to Mr. Watkins' motion.  *See* doc. 86.

_____

      [1] Julie Jones became Secretary of the Department of Corrections on January 5, 2015, and was substituted for Interim Secretary Timothy Cannon.  Doc. 86.

      [2] Defendants first re-filed Exhibits E and F on December 8, 2014, doc. 78, and then again on December 9, 2014.  Doc. 80.  The reason the exhibits were re-filed was unexplained, but appears to be a computer glitch with the electronic record.  Only the second filing of the exhibits, doc. 80, is reviewed within this Report and Recommendation.

Mr. Watkins also filed a notice in February 2015 stating his intent to rely upon a recent decision of the United States Supreme Court in Holt v. Hobbs.  Doc. 87.  That decision guides analysis of this case.[3]

## I.    Procedural Status

The fifth amended complaint ("complaint"), doc. 29, was filed by Mr. Watkins on May 2, 2013.  Doc. 29.  The complaint asserted claims against the Secretary of the Florida Department of Corrections and Mr. Fox, the Senior Chaplain at Wakulla Correctional Institution.  Doc. 29 at 1.  Subsequently, Mr. Fox was dismissed from this case, doc. 58, and Julie Jones was substituted as the Secretary, doc. 86.  Additionally, one claim concerning the denial of prayer oils was dismissed because it was not properly exhausted.  Doc. 58.  Mr. Watkins' case continues against the Secretary only, with four surviving claims.

Mr. Watkins has alleged that his First and Fourteenth Amendment rights to freely practice his religious faith (Sunni Muslim) are violated by Department of Corrections' policies and have substantially burdened the practice of his faith.  Doc. 29 at 9-10. Specifically, Mr. Watkins presents four discrete claims: (1) he is prohibited from growing a beard; (2) he has not been provided a Halal diet, (3) not provided Halal food during the Eids, and (4) he is required to participate in an inclusive Jumu'ah Prayer with Nation of Islam adherents, which he advises has a belief system which differs greatly from Sunni Muslim beliefs.  Id. at 6-9.  Each of these policies are challenged on First and

_____

[3] In Holt v. Hobbs, 135 S. Ct. 853, 859, 190 L. Ed. 2d 747 (2015), the Court held that "the Arkansas Department of Correction's grooming policy, which prohibits inmates from growing beards unless they have a particular dermatological condition" violated the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 114 Stat. 803, 42 U.S.C. § 2000cc, et seq.

Fourteenth Amendment grounds, as well as under the Religious Land Use and Institutionalized Persons Act (RLUIPA).  Mr. Watkins seeks only prospective injunctive relief.  *Id.* at 10.

## II.    Legal standards governing a motion for summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Thus, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2553.  The non-moving party must then show[4] the court "that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325, 106 S. Ct. at 2554.

---

[4] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' "  Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied,* 522 U.S. 1126 (1998) (quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  Owen, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

An issue of fact is "material" if it could affect the outcome of the case.  Hickson

Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations

omitted).  A party must show more than the existence of a "metaphysical doubt"

regarding the material facts, Matsushita Elec. Indus. Co., LTD. v. Zenith Radio Corp.,

475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of

evidence is insufficient.  The court must decide "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law."  Hickson Corp., 357 F.3d at 1260 (quoting

Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202

(1986)).  All reasonable inferences must be resolved in the light most favorable to the

nonmoving party, Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999), if

there is a genuine dispute as to those facts.  Scott v. Harris, 550 U.S. 372, 380, 127

S.Ct. 1769, 167 L.Ed.2d 686 (2007) (cited in Ricci v. DeStefano, 129 S.Ct. 2658, 2677

(2009).  "Where the record taken as a whole could not lead a rational trier of fact to find

for the nonmoving party, there is no genuine issue for trial."  Matsushita Elec. Indus.

Co., 475 U.S. at 587 (internal quotation marks omitted) (quoted in Ricci v. DeStefano,

129 S.Ct. at 2677).

"Cross motions for summary judgment do not change the standard."  Latin Am.

Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church, 499

F.3d 32, 38 (1st Cir. 2007) (quoted in Ernie Haire Ford, Inc. v. Universal Underwriters

Ins. Co., 541 F. Supp. 2d 1295, 1297 (M.D. Fla. 2008).  " 'Cross motions for summary

judgment are to be treated separately; the denial of one does not require the grant of

another.' "  Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n, 483 F.3d

1025, 1030 (10th Cir. 2007) (quoting Buell Cabinet Co. v. Sudduth, 608 F.2d 431, 433

(10th Cir. 1979)) (quoted in Ernie Haire Ford, Inc., 541 F. Supp. 2d at 1297-98).

Because Mr. Watkins (as the party with the burden of proof) has a heavier burden on

summary judgment, the Court will consider the Secretary's motion first.  If that motion is

denied, the Court will consider whether Mr. Watkins is entitled to judgment as a matter

of law.

### III.    Rule 56 evidence

Secretary Jones submitted the declaration of Alex Taylor, the Chaplaincy

Services Administrator for the Florida Department of Corrections, who advises that

Departmental policy is "to extend to all inmates the greatest amount of freedom and

opportunity for pursuing individual religious beliefs and practices consistent with the

security and good order of the institution."  Doc. 77, Ex. H at 1-2 (Doc. 77-8).  The

Florida Department of Corrections houses "over 101,000 inmates" representing

approximately 111 different faith groups, including those who identified their faith as

none, unknown, or refused to answer.  Id. at 1; see also Att. 1, doc. 77, Ex. H (doc. 77-8

at 5).  As of August of 2014, 4,275 inmates identified themselves as Muslim, comprising

six separate Muslim faith groups: a generic Muslim selection, Shiite Muslim, Sunni

Muslim, Sufi Muslim, the Nation of Islam, and Moorish Science.  Id. at 1; see also Att. 1,

doc. 77, Ex. H (doc. 77-8 at 7).  Mr. Taylor advises that although the inmate population

is constantly changing, "the percentages of the various religious preferences in the total

population stay fairly constant."  Id. at 1.  The Muslim designation amounts to

approximately 4.2 percent of the inmate population.  Id.

To accommodate religious freedom, the Department schedules religious services, permits religious literature along "religious correspondence," and inmates may possess "appropriate religious items" and meet with spiritual advisors.  Doc. 77, Ex. H at 2 (Doc. 77-8).  Due to budgetary considerations, "chaplains must rely more heavily upon approved volunteers to conduct group services."  *Id.*

An "inclusive nondenominational service for Christians and an inclusive Jumu'ah Prayer service for Muslims have been in place" for many years in an effort to afford "the greatest number of inmates the opportunity to access institutional chapels where use is subject to appropriate time, space, and supervision."  *Id.*  Mr. Taylor explains that:

> Institutional chapels are multipurpose buildings, with inmates using the chapel for purposes of study, personal contemplation, rehabilitative programs, and congregant worship of groups of varying sizes. The scheduling of activities for some necessarily crowds out the activities of others.  Additional noise and overflow can impact effective supervision. Moreover, provision of Chaplaincy services is affected by staff shortages and the administrative responsibilities chaplains must perform, necessitating heavy reliance upon approved volunteers to conduct group services.  Accordingly, consolidating groups with major doctrinal similarities promotes efficient use of chaplaincy resources for the institution's inmate population.  Holding separate services for Sunni Muslim inmates would undermine the fair distribution of limited resources of time, space, and supervision.

Doc. 77, Ex. H at 2 (doc. 77-8).  Thus, inclusive groups meet to maximize time, space, and supervision needs, as well as factor in the need for approved volunteers and proportionate access to the chapel.  *Id.*

Secretary Jones provided copies of the "Chaplain's Calendar of Events" at Gulf C.I. Annex for March 2013 through October of 2014.  Doc. 80 Ex. F.  The calendars generally reveal that Jumu'ah services are scheduled every Friday at 12:30 p.m.  *Id.* The Jewish services and Hebrew Israelite services are also scheduled every Friday at

12:30 p.m.  *Id.*; *see also* doc. 84, Ex. G (doc. 84 at 39).  The calendar reveals one

inclusive "Worship Service" which is scheduled on Sundays at 1:00 p.m., and a

Jehovah Witness service scheduled for Saturdays at 1:00 p.m.  Doc. 84, Ex. G.  The

calendars do not show there are separate services scheduled for Baptist, Methodist,

Presbyterian, or even Catholic faith groups.

> Friday is the most important day of worship in Islam.  It is the weekly
> occasion earmarked by God for Muslims to express their collective
> devotion, Jumah Prayer.  Islamic lay jurists generally agree that two or
> more adult Muslims are usually required to hold the Friday congregational
> service.  Ritual washing (ablution) is required before the prayer. . . .  The
> prayer starts with a formal sermon (Khutbah) and is followed by the
> prayers. . . .  All kinds of normal work are allowed on Fridays as on any
> other weekday.  Friday congregational prayer is obligatory for all Muslim
> inmates, both male and female.  Jumah prayer for Muslims is scheduled
> every Friday between 11:30 a.m. and 2:30 p.m. for a one to two hour
> service.

Doc. 77, Ex. H, Att. 4 (doc. 77-8 at 9).

Inclusive or "communal services" have been provided "for more than fifteen years

for Jumu'ah, feast days, and Ramadan."  Doc. 77, Ex. H at 3 (doc. 77-8).   "Muslim

services are conducted in such a manner as to be non-sectarian and provide for all

Muslim inmates regardless of the different schools of teaching among the various

Muslim faith groups."  *Id.*  "Should an inmate feel that an aspect of the service has

become overtly sectarian or political, the grievance procedure is available to bring the

matter to the institutional chaplain's attention."  *Id.*  "Any inmate of any faith who would

abuse their chapel access by provoking a disruption in a religious service (or any

program in a correctional institution) would be subject to removal from the service or

program and possibly subject to other action depending on the nature and extent of the

disruption."  *Id.*  More specific beliefs may be pursued through religious

correspondence, religious literature, and visits by the inmate's "spiritual advisor of his or her choice."  *Id.*

Mr. Watkins testified in his deposition that there were times that Jumu'ah services had "altercations" because of differences between Nation of Islam beliefs and Sunni Muslim beliefs.  Doc. 77, Ex. L (doc. 77-12 at 10-12).  For example, Mr. Watkins explained that Nation of Islam followers "believe in separation of race" and only respect "the brown races" whereas Sunni Muslims treat all men and women as equal persons.  *Id.* at 10-11.  In spite of the divisions, there were no physical altercations.  *Id.* at 12-14.

Secretary Jones submitted the declaration of Kimberly Stavenau, a Senior Chaplain at Gulf Correctional Institution where Mr. Watkins is housed.  Doc. 77, Ex. G at 1 (doc. 77-7).  She advises that departmental policy directs "one inclusive Jumu'ah prayer service each Friday afternoon for all Muslim denominations."  *Id.*  That is similar to the weekly nondenominational Christian services which are provided on Sundays."  *Id.*  Because there are no outside Muslim volunteers to lead Jumu'ah prayer at Gulf C.I., Muslim inmates meet on a weekly basis under supervision of chaplaincy staff or security staff.  Doc. 77, Ex. G at 1 (doc. 77-7).  The Department's policy permits "individual Muslim inmate to speak on a rotating basis."  *Id.*  It is asserted that the policy promotes "fairness to different Muslim denominations and due to the security concerns resulting from one inmate being in a position of authority over other inmates."  *Id.*  The speaker rotation is open to any interested inmates, "so long as the content of the inmate's speech is not racist, inciteful, or disparaging to other religious groups."  *Id.*  The Department strikes "to keep at least three or four inmates on the rotation to keep any one inmate from speaking too frequently."  *Id.*  Chaplaincy staff at Gulf Correctional

Institution where Mr. Watkins is currently housed have "not observed or been informed of any disruptions of security problems with [the] inclusive Jumu'ah prayer service." *Id.* at 2 (doc. 77-7).

Mr. Watkins "regularly attends Jumu'ah prayer service each Friday afternoon" at Gulf Correctional Institution's Annex.  Doc. 77, Ex. G at 1 (doc. 77-7); *see also* doc. 80, Ex. E (doc. 80-1).  Mr. Watkins has spoken at Jumu'ah prayer on at least three occasions.  Doc. 80, Ex. E at 23, 30 (doc. 80-1 at 23, 30).

Mr. Taylor has provided additional information in his declaration about the "Department's Religious Diet Program" [RDP].  Doc. 77, Ex. H at 3 (doc. 77-8).  The RDP provides availability "of a vegan (no animal product), alternate entree (meatless), and certified food (kosher) dietary options for those inmates whose religious beliefs would be accommodated by such diets."  *Id.*  No pork products are served.[5]  *Id.*  Many Muslim inmates have found that the "certified food" option (CFO) "satisfies their religious dietary needs on a daily basis."  *Id.*  "The CFO is still being implemented statewide through the FDOC's Religious Diet Program Implementation Schedule."  *Id.*  "As of October 9, 2014, a total of 70 facilities, including major institutions as well as satellite facilities, are now serving the CFO."  *Id.*  "Those 70 facilities are assigned just over 50% of the total inmate population."  *Id.*  Mr. Watkins is currently housed at the Gulf Correctional Institution Annex.  Mr. Taylor advises that CFO meals were scheduled to begin there on January 9, 2015.[6]  *Id.*  Mr. Watkins testified at his deposition, taken

---

[5] Muslims are not permitted to have pork or any of its derivatives.  Doc. 77, Ex. H, Att. 4 (doc. 77-8 at 8).

[6] Mr. Watkins has been approved to receive the CFO "once Gulf Correctional Institution Annex begins serving those meals."  Doc. 77, Ex. G at 1 (doc. 77-7).  It

prior to implementation of the CFO at his institution, that if his meal were "certified Kosher" it "would solve the problem" and satisfy his daily religious dietary needs because kosher food is sufficiently Halal.  Doc. 77, Ex. L (doc. 77-12 at 30-31).

"The Muslim religious holidays recognized by the Department are Eid ul Fitr (Feast of Fast Breaking), Eid ul Adha (Feast of Sacrifice), and Ramadan."  Doc. 77, Ex. H at 3 (Doc. 77-8); *see also* Att. 4, Ex. H (doc. 77-8 at 8).  "Observance of Eid ul Fitr and Eid ul Adha includes participating in a religious meal, which is a regular meal with special religious significance that is consumed by Muslim inmates separately from regularly scheduled meals by time and/or location."  Doc. 77, Ex. H at 3 (Doc. 77-8). Eid ul Adha is "one of the most significant days of the Muslim calendar."  Doc. 77, Ex. H, Att. 4 (doc. 77-8 at 11).  "On the morning of the Eid ul Adha eligible Muslim inmates will be on call out and directed to a room approved by the institutional Warden for two hours of prayers . . . ."  *Id.*  "This event includes a meal and appropriate traditional Muslim teachings or practices."  *Id.*  "The institutional Chaplain will arrange with the Food Service Department to provide a religious meal for the Muslim inmates and guests[7] during the evening of Eid ul Adha to eat at a designated location approved by the Warden."  *Id.*  Religious meals are to be "separated from regularly scheduled meals

_____

appears that Mr. Watkins is now receiving the CFO.  Doc. 84 at 8.  Although not presented as admissible evidence, Mr. Watkins argues the CFO is a "mockery" because it is served cold and not a hot meal which other inmates receive.  *Id.* at 7,  He also asserts that it contains beans, which are gaseous, which means he cannot "remain in a state of purity or cleanliness for prayer . . . ."  *Id.*

[7] A Muslim inmate may have up to two family guests" for this event.  Doc. 77, Ex. H, Att. 4 (doc. 77-8 at 12).  The guests must "pay the normal cost of an institutional meal."  *Id.*

by either allotted time or by arranging a separate place for observance."  Doc. 77, Ex. J, Att. 4 (doc. 77-8 at 11); Doc. 84, Ex. I (doc. 84 at 58).

Similarly, the Eid ul Fitr also consists of a religious meal.  Doc. 77, Ex. H, Att. 4 (doc. 77-8 at 12-13).  The requirements are similar for this event as eligible Muslim inmates will be on a call out for two hours of prayer in the morning.  *Id.*  The Chaplain is to arrange a religious meal with the Food Service Department, and Muslim inmates may have up to two family guests participate in this event as well.  *Id.* at 13.

The Department "does not provide special foods[8] for these observances."  *Id.* "However, in some cases, special food may be permitted to be donated or purchased, with approval given on a case by case basis."  Doc. 77, Ex. H at 3 (Doc. 77-8).[9] Mr. Taylor advised that there are "comparatively few Muslim volunteers, and" he was "not aware of any organizations willing to donate food to inmates for Muslim feasts."  *Id.*

As far as determining whether special food for religious observances could be donated or purchases, three factors are considered.  Doc. 77, Ex. H at 3-4 (Doc. 77-8). The food must have a religious significance to the holiday, there may not be "security problems with the type, use or source of the food," and the "food must be prepackaged or provided by a licensed vendor."  *Id.* at 4.

---

[8] Although not presented as evidence, Mr. Watkins has argued that a "special meal [is] prepared for the day of the 25th of December and for Easter . . . ."  Doc. 84 at 12.  Mr. Watkins claims that the Department has "made room for" those meals in the budget to accommodate the Christian faith.  *Id.*

[9] Mr. Watkins argues that "no set standard has been set or made notice of, nor has anyone notified the inmate population as to the qualifications of these 'case by case basis.' "  Doc. 84 at 13.

Mr. Watkins testified in his deposition that while he was housed at Wakulla Correctional Institution, he arranged "for the chaplain to get in contact with [a] sponsor so that he [could] have the food brought in" for the Eid celebrations.  Doc. 77, Ex. L (doc. 77-12 at 35-36).  Mr. Watkins said that the "chaplain said no" and did not give a reason for his refusal.  *Id.*  Mr. Watkins said that he was unaware of any Muslim volunteers at Gulf Correctional Institution, but knew of someone who could donate food. *Id.* at 37.  When asked whether he had talked with the chaplain about that, he replied no, advising he felt constrained to not "cause waves of any kind."  *Id.* at 37-38. Mr. Watkins did, however, submit an informal grievance to Chaplain Stavenau requesting that Halal food be served for the two Islamic holidays.  Doc. 84, Ex. H (doc. 84 at 41).  He also complained that when served a meal for the Eid ul Fitr (the Eid which is held after Ramadan),[10] it was served in the compound chow hall while the regular meal was being served, and the Muslim inmates "were rushed to eat like the rest of the compound."  *Id.* at 41-42.

Chaplain Stavenau advises that she has often been presented with special food requests from inmates.  Doc. 77, Ex. G at 2 (doc. 77-7).  However, she asserts that Mr. Watkins' requests for special Halal food for the Eid ul Fitr and Eid ul Adha are the first requests she recalls receiving for Halal food.  *Id.*  She states that some religious organizations "will donate food to inmates for holiday celebrations, but [she is] not aware of any such organization for Muslim inmates."  *Id.*  Chaplain Stavenau has never "arranged for Muslim inmates to purchase special food for religious celebrations."  *Id.*

---

[10] Doc. 77, Ex. H, Att. 4 (doc. 77-8 at 12-15).

She advises that "[s]uch a practice could be permitted on a case by case basis, subject to appropriate approval, but no Muslim group has requested to donate food items."  *Id.*

A declaration from James R. Upchurch advises that there are "serious security issues implicated by providing special, individualized religious diets to Florida's inmates."  Doc. 77, Ex. I at 1 (doc. 77-9).  The primary security concern is the perception of preferential treatment.  *Id.* at 1-2.  For that reason, Florida prisons maintains "a regimented and controlled environment."  *Id.* at 2.  "Consistency of expectations and enforcement is absolutely essential to maintaining order in a prison environment."  *Id.*  "Inmates are generally prone to react jealously, rather than try to understand why another inmate is getting a benefit or privilege they are not."  *Id.*  "Specialized meals, especially those regarded as better quality or otherwise more desirable than normal fare, are among those privileges which would cause such discord and unrest."  *Id.*

"The Religious Diet Program's Certified Food Option ("CFO") was originally implemented beginning at Union Correctional Institution on July 1, 2013, using prepackaged shelf-stable meals heated in microwaves as well as supplemental food items."  Doc. 77, Ex. K at 1 (doc. 77-11).  In March of 2014, the CFO was changed to a cold food menu only which reduced the cost to "$3.53 per inmate per day."  *Id.*  That "is significantly higher than the other diets provided, which are approximately $1.80 for the regular fare, and therapeutic medical diets ranging from approximately $2.00 to $3.00."  *Id.*  It is estimated that if Mr. Watkins were provided a prepackaged halal diet plan as he has requested, it would cost approximately $13.88 per inmate per day.  *Id.*  In addition to the increased cost for food, it would "also require the purchase of specialty equipment

such as microwaves and heated cabinets."  *Id.* at 2.  Costs associated with those "equipment and facility enhancements . . . are estimated at $30,000 to $45,000 per facility."  *Id.*  It was explained that one commercial microwave costs $1,000.00 and one heated microwave costs $4,000.00.  *Id.*  Additionally, institutions would need to "ensure adequate space and electrical power is available to support the new equipment needed."  *Id.*  The budget appropriation for the Florida Department of Corrections as passed by the 2014 legislature was $2,299,631,064.00.  Dox. 77, Ex. J at 1 (doc. 77-10).

Mr. Upchurch's declaration explains that Rule 33-602.101(4) of the Florida Administrative Code requires all male inmates to be clean shaven and have their hair cut short to medium uniform length at all times with no part of the ear or collar covered." Doc. 77, Ex. I at 4 (doc. 77-9).  "The Department maintains a 'clean-shaven' 'short-hair' rule for male inmates for a variety of reasons including health, hygiene, and safety and security concerns. *Id.*  Requiring "uniform hair length and style prevents the use of a particular type of hairstyle, such as fade and sculpted cuts, as a mechanism for gang or associational identification."  *Id.*  "Gang activity in a prison setting presents serious security and safety problems, a potential for riots, personal injury to staff and inmates, and damage to property."  *Id.*  Requiring "closely trimmed facial hair helps to eliminate a potential for concealing of contraband."  *Id.*  It also allows staff to "quickly and accurately identify inmates by their photograph on their identification cards."  *Id.* at 4-5. The clean-shaven requirement is argued as a means to prevent escape by minimizing a "prisoner's ability to alter and vary his appearance . . . ."  *Id.*

"There are limited exceptions to the clean shaven requirement for medical and security purposes only."  Doc. 77, Ex. I at 5 (doc. 77-9).  One medical exception is for inmates with pseudofolliculitis barbae, "which is an inflammation of the hair follicles due to shaving."  *Id.*  Inmates with this type of shaving pass must maintain a closely trimmed beard "not to exceed one quarter inch in length."  *Id.*

Another exception to the clean shaven rule based on security concerns is for inmates with mental health classifications of S-3 or higher.  *Id.*  Those inmates must be "clipper shaved three times per week" to protect them from harming themselves if they had access to razor blades.  *Id.*  In this case, the inmates are not left with facial hair, but are "clean shaven three times per week."  *Id.*  "The maximum facial hair length for these inmates is the amount that would grow in approximately three days."  *Id.*  Additionally, the grooming policy has been recently amended to give wardens discretion "to require that all inmates be clipper shaved three times per week if allowing the use of razors create[d] a substantial risk ot the security of the institution or the safety of inmates and staff."  *Id.*  At present, approximately one third of the institutions use that alternative "to combat the serious security problems created by razor blades in certain prisons."  *Id.*

Mr. Upchurch declares that permitting Mr. Watkins to have a religious exemption to the clean shaven rule would present "a management problem where security staff would need to spend extra time confirming the approval of his grooming exception."  *Id.* at 5-6.  Additionally, it is asserted that preferential treatment could cause discord among the inmate population and create a hostile environment for staff and other inmates.  *Id.* at 6.  Mr. Upchurch notes that inmates "of the Jewish, Native American, Muslim, Rastafarian, and Hebrew Israelite faith - just to name a few, have requested . . .

religious exemptions from the grooming code so that they may grow their hair and/or beard in accordance with the tenets of their religion." *Id.* "Their requests have been denied repeatedly." *Id.* Mr. Upchurch explains:

> Inmates expect to be treated the same, and the legitimacy of the reason why some may be treated differently makes no difference to them. Consistency of expectations and enforcement is absolutely essential to maintaining order in a prison environment. Inmates who observe another inmate not being made to comply with a rule will assume that staff are providing tacit approval and that they do not have to comply either.

Doc. 77, Ex. I at 6 (doc. 77-9).

Mr. Watkins has demonstrated that he is a Muslim and is compelled by his faith to consume a Halal diet in conformity with Islamic law. Doc. 84, Ex. A (doc. 84 at 24). The diets offered by the Department of Corrections (regular vegan, or alternate meal trays) are sinful to him and violate Islamic dietary laws. *Id.*

**Analysis**

Congress enacted the Religious Freedom Restoration Act of 1993 (RFRA) to "provide greater protection for religious exercise than is available under the First Amendment." Holt v. Hobbs, 135 S. Ct. 853, 859-60, 190 L. Ed. 2d 747 (2015) (citing Burwell v. Hobby Lobby Stores, Inc., 573 U.S. ——, 134 S.Ct. 2751, 2760-61, 189 L.Ed.2d 675 (2014)). Congress enacted RFRA by relying "on Section 5 of the Fourteenth Amendment, but in City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), [the Supreme] Court held that RFRA exceeded Congress' powers under that provision." Holt, 135 S. Ct. at 860 (citing City of Boerne, *Id.*, at 532–536, 117 S.Ct. 2157).

> Congress responded to City of Boerne by enacting RLUIPA, which applies to the States and their subdivisions and invokes congressional authority

under the Spending and Commerce Clauses. *See* § 2000cc–1(b). RLUIPA concerns two areas of government activity: Section 2 governs land-use regulation, § 2000cc; and Section 3—the provision at issue in this case—governs religious exercise by institutionalized persons, § 2000cc–1. Section 3 mirrors RFRA and provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." § 2000cc–1(a). RLUIPA thus allows prisoners "to seek religious accommodations pursuant to the same standard as set forth in RFRA." Gonzales v. O Centro Espírita Beneficente Uniõ do Vegetal, 546 U.S. 418, 436, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006).

Holt, 135 S. Ct. at 860.

Several provisions of RLUIPA underscore its expansive protection for religious liberty. Congress defined "religious exercise" capaciously to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." § 2000cc–5(7)(A). Congress mandated that this concept "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." § 2000cc–3(g). And Congress stated that RLUIPA "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." § 2000cc–3(c).

135 S. Ct. at 860 (citing Hobby Lobby, 134 S.Ct. at 2761–62, 2781–82). "RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." Cutter v. Wilkinson, 544 U.S. 709, 721, 125 S. Ct. 2113, 2122, 161 L. Ed. 2d 1020 (2005).

In supporting his RLUIPA claims, Mr. Watkins bears the burden of "showing that the relevant exercise of religion is grounded in a sincerely held religious belief,"[11] and he

---

[11] The particular religious belief need not be "shared by all of the members of a religious sect." Thomas v. Review Bd. of Indiana Emp't Sec. Div., 450 U.S. 707, 715-

must also demonstrate that the challenged Department of Corrections' policies have

"substantially burdened[12] that exercise of religion."  Holt, 135 S. Ct. at 862.  If

Mr. Watkins meets his burden, the burden then shifts to the Secretary to show that the

Department's policies are (1) "in furtherance of a compelling governmental interest" and

(2) are "the least restrictive means of furthering that compelling governmental interest."

Id. at 863 (quoting § 2000cc–1(a)).  "[I]f a less restrictive means is available for the

Government to achieve its goals, the Government must use it."  United States v.

Playboy Entm't Grp., Inc., 529 U.S. 803, 815, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000)

(quoted in Holt, 135 S. Ct. at 864).

## A.    Beard

Mr. Watkins challenges the policy which permits a ¼-inch beard to be grown for

inmates with a shaving pass, given only for medical reasons.  He asserts that the

requirement that he be "clean shaven" is "a substantial burden on his practice of his

religion."  Doc. 84 at 17.  He contends that it cannot be argued that a ¼-inch beard is a

valid security interest since it is permitted for a medical reason.  Id.  The United States

Supreme Court has agreed.

The Supreme Court concluded in Holt v. Hobbs that the Arkansas Department of

Corrections had a "compelling interest in staunching the flow of contraband into and

within its facilities," but rejected the argument that allowing an inmate to grow a ½-inch

---

716, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (quoted in Holt, 135 S. Ct. at 863).

[12] Analysis of these RLUIPA claims must recognize the distinction between First Amendment constitutional claims and RLUIPA claims.  "RLUIPA's 'substantial burden' inquiry asks whether the government has substantially burdened religious exercise . . ., not whether the RLUIPA claimant is able to engage in other forms of religious exercise." 135 S. Ct. at 862.

beard would further that interest.  Holt, 135 S. Ct. at 863-64 (stating that "the argument that this interest would be seriously compromised by allowing an inmate to grow a ½-inch beard is hard to take seriously.").  The Court also was unpersuaded by the argument that it was necessary to prevent prisoners from disguising their identities.  *Id.* at 864-65.  The shaving policy was deemed to be "substantially underinclusive" because beards could be grown for dermatological reasons and hair length, clothing, and shoes are more "plausible" places to "hide contraband than a ½-inch beard . . . ."  *Id.* at 866 (noting the "Department does not require inmates to go about bald, barefoot, or naked.").  Furthermore, the fact that "the vast majority of States and the Federal" Bureau of Prisons "allow inmates to grow beards while ensuring prison safety and security suggests that the Department could satisfy its security concerns through a means less restrictive than denying petitioner the exemption he seeks."  *Id.* [13]

Here, Secretary Jones[14] does not dispute that having a ¼-inch beard is grounded in Mr. Watkins' sincerely held religious beliefs, nor is it disputed that the clean shaven rule substantially burdens the exercise of his faith.  Secretary Jones has done little more than point to prior case law which had upheld the Department's grooming regulations, premised on the compelling interest arguments that the no beard rule was necessary to

---

[13] The Court clarified that RLUIPA does not require a prison to grant a particular religious exemption because other jurisdictions have done so.  Holt, 135 S. Ct. at 866.  "But when so many prisons offer an accommodation, a prison must, at a minimum, offer persuasive reasons why it believes that it must take a different course, and the Department failed to make that showing here."  *Id.*

[14] As an initial matter, judicial notice is taken that the Florida Department of Corrections receives federal funds and is subject to RLUIPA.  United States v. Sec'y, Florida Dep't of Corr., No. 12-22958-CIV, 2013 WL 6697786, at *1 (S.D. Fla. Dec. 6, 2013) judgment vacated, appeal dismissed, 778 F.3d 1223 (11th Cir. 2015).

prevent contraband and readily identify a prisoner who may try to escape by suddenly altering his appearance.  Doc. 76 at 41-45.  That prior case law has now been overruled by Holt.  The additional argument that allowing a beard for religious reasons could prevent "efficient and secure inmate movement within [a] prison" is not compelling.  An I.D. card and shaving pass may readily be displayed to maintain efficient movement where familiarity is absent.  Furthermore, to the degree it is argued that the grooming policy is related to reducing gang activity, the policy cannot be found to be the least restrictive means of furthering that admittedly important interest.  That is so because at approximately one third of the State's institutions, inmates are permitted to go up to three days without shaving.  The amount of facial hair that can grow within a three day time period will vary considerably and an inmate's appearance will be in  constant flux.  Permitting facial hair to grow in that manner significantly weakens the argument that an allowance of a consistent ¼-inch beard will further gang activity.  The motion for summary judgment filed by Secretary Jones should be denied as to this claim.  Furthermore, the Holt decision requires granting summary judgment in Mr. Watkins' favor.  As relief is appropriate under RLUIPA, there is no need to further evaluate this claim under the First or Fourteenth Amendments.

**B.    Halal Diet**

It is not disputed that when Mr. Watkins filed this lawsuit in April 2012, he wanted to be served Halal food.  He has acknowledged that the CFO is kosher and suits his religious needs.  He now receives the CFO at Gulf Correctional Institution.  Though he is not entirely satisfied that his meal is cold and not hot, and that it still consists of beans, it is, apparently, kosher.  Thus, Mr. Watkins requested only injunctive relief in his

fifth amended complaint, doc. 29 at 10, and he has now received that relief because he is receiving the CFO.

Neither Secretary Jones nor Mr. Watkins have suggested that this claim is moot. This Court, however, has an independent obligation to determine that it has jurisdiction to decide the issue as it has "no power to issue advisory opinions." N. Carolina v. Rice, 404 U.S. 244, 246, 92 S. Ct. 402, 404, 30 L. Ed. 2d 413 (1971); United States v. Sec'y, Florida Dep't of Corr., 778 F.3d 1223, 1226 (11th Cir. 2015) (stating that"[a]lthough the parties did not raise any question about mootness, we have an obligation to notice and decide mootness issues.").  "The exercise of judicial power under Art. III of the Constitution depends on the existence of a case or controversy." Preiser v. Newkirk, 422 U.S. 395, 401, 95 S. Ct. 2330, 2334, 45 L. Ed. 2d 272 (1975).  "If events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the Plaintiff should carefully review the foregoing to determine whether plaintiff or appellant meaningful relief, then the case is moot and must be dismissed." Al Najjar v. Ashcroft, 273 F.3d 1330, 1336 (11th Cir. 2001).

One importation exception to the mootness doctrine is implicated here: voluntary cessation.  Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173, 1183 (11th Cir. 2007) (cited in Thomas v. Branch Banking & Trust Co., 32 F. Supp. 3d 1266, 1268 (N.D. Ga. 2014).  This exception was explained in Sheely as follows:

> It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.  If it did, the courts would be compelled to leave the defendant free to return to his old ways.  In accordance with this principle, the standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is *stringent*: A case

*might* become moot if subsequent events made it *absolutely* clear that the allegedly wrongful behavior *could not reasonably be expected to recur*.

*Id.* at 1183–84 (emphases in original) (quoting <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)) (quoted in <u>Thomas</u>, 32 F. Supp. 3d at 1268).

There are several reasons why Mr. Watkins' claim concerning a Halal diet is not moot.   First, Secretary Jones has argued in this case that Mr. Watkin's request for a Halal diet should be rejected because courts have previously upheld the alternate entree program as sufficient.  Doc. 76 at 27-28.  The Secretary has consistently maintained the argument that there is a compelling state interest in containing costs which justifies *not* serving kosher meals.  *Id.* at 28-31.  Secretary Jones also contends that this Court should reject any argument that Halal or kosher diets should be implemented in Florida because other states and the federal Bureau of Prisons provides those meals.  *Id.* at 31.  Furthermore, it is argued that although such a diet is currently being implemented, the Department should not be precluded from discontinuing the diet program in a fiscal crises.  *Id.* at 32.  These arguments demonstrate that the offer of kosher food is tentative and half-hearted and may just as easily be retracted as maintained.  Secretary Jones is providing the CFO while maintaining that the RLUIPA does not compel its offering.[15]  Thus, the underlying ideology is that the Department has bestowed a benefit to inmates in offering the CFO, but it should remain free to "choose

---

[15]  "The Florida Department of Corrections has made a policy decision to provide an accommodation for those inmates whose religious beliefs require them to keep kosher, but the Department firmly believes that whether that policy decision should be implemented, and how and when it should be implemented, is not compelled by RLUIPA given the substantial costs associated with providing this type of religious diet." Doc. 76 at 31, n.5.

to discontinue a religious diet program in a fiscal crises . . . ."  *Id.* at 32.  The message

conveyed is clear: the Department is not committed to the CFO and is unwilling to admit

that doing so is an unwavering obligation rather than a gracious gesture.  That message

lends support to the finding that the allegedly wrongful behavior is reasonably likely to

recur.

The second reason is the Department's history which was set forth in United

States v. Sec'y, Florida Dep't of Corr., No. 12-22958-CIV, 2013 WL 6697786 (S.D. Fla.

Dec. 6, 2013) judgment vacated, appeal dismissed, 778 F.3d 1223 (11th Cir. 2015).[16]

That history reveals that the voluntary cessation here is not an unambiguous change in

policy.  *See* Rich v. Sec'y, Florida Dep't of Corr., 716 F.3d 525 (11th Cir. 2013) (finding

creation of RDP did not moot claim for kosher meals).

Prior to 2004, the Florida Department of Corrections "did not offer a kosher diet

to any prisoners."  United States, 2013 WL 6697786, at *1.  In September 2002, inmate

Alan Cotton "filed suit in the U.S. District Court for the Southern District of Florida

seeking a kosher diet."  *Id.*  (citing Cotton v. Dep't of Corr., No. 1:02-cv-22760 (S.D. Fla.

2002).  "In April 2004, shortly after the Cotton case settled, Defendants instituted a

kosher diet program known as the Jewish Diet Accommodation Program ("JDAP")."  *Id.*

---

[16] The Eleventh Circuit vacated the Department's appeal of a preliminary
injunction on the basis that it was moot because the injunction expired after 90 days.
United States v. Sec'y, Florida Dep't of Corr., 778 F.3d 1223, 1228 (11th Cir. 2015).
That necessitated also vacating that portion of the district court's order addressing the
preliminary injunction.  United States, 778 F.3d at 1229-30.  Notwithstanding, vacating
the injunction does not change the Department's history.  Hence, the historical record of
providing a kosher menu option as outlined in that case is noted herein.  Moreover, a
new injunction has now been entered.  *See* United States v. Sec'y, Florida Dep't of
Corr., No. 12-22958-CIV, 2015 WL 4768247 (S.D. Fla. Aug. 12, 2015) (analyzing terms
of the injunction under "the PLRA's need-narrowness-intrusiveness standard.").

The JDAP offered kosher meals in only 13 facilities and eligible prisoners were transferred to one of those facilities.  *Id.*  "Initially, only Jewish prisoners were eligible to participate in JDAP, but" the program was opened to "prisoners of all faiths in 2006."  *Id.* In early 2007, then Secretary Jim McDonough "commissioned a Religious Diet Study Group to evaluate JDAP."  *Id.*  In July 2007, the Study Group issued a report recommending that the kosher dietary program be retained.  *Id.*  Moreover, the report concluded that failing to do so would likely violate RLUIPA.[17] *Id.*  Despite the recommendation, the JDAP was terminated in August 2007.  *Id.* at *2.  For the next three years the Department did not offer a kosher diet to any prisoners.  *Id.*  In August 2010, a new "pilot" kosher diet program (the "Pilot Program") was instituted solely in the South Unit of the South Florida Reception Center ("SFRC").  *Id.*  "The Pilot Program was never expanded to any facility besides SFRC."  *Id.*  However, in October 2010, the Department asserted a commitment to expanding the Pilot Program, but never did so. *Id.*  "In May 2011, the United States opened a formal investigation of FDOC's dietary policies."  *Id.* at *3.  By the August 2012 conclusion of the investigation, the United States concluded that the "failure to offer a kosher diet violated RLUIPA."  *Id.*  The Department refused to change their policies and the United States filed suit in the Southern District.  *Id.*  After the denial of the Department's motion to dismiss and while engaging in court-ordered mediation in January 2013, the Department "agreed to submit a kosher diet proposal to the United States by March 4, 2013."  *Id.*  "On March 22, 2013,

---

[17]  "The Study Group stated that a prisoner desiring to keep kosher 'is substantially burdened' by the denial of kosher food 'because the regulations [denying a kosher diet] leave him with no meaningful choice. He may either eat the non-kosher food and fail to obey his religious laws or not eat the non-kosher food and starve.' "  *Id.*

while the case was stayed for settlement discussions, Defendants issued a new

policy-Procedure 503.006-called the Religious Diet Program." *Id.* However, the

Department "did not notify the United States of this new policy." *Id.* Instead, the United

States "learned of the policy on April 2, 2013[,] from counsel in separate litigation . . . ."

*Id.* The give and take history of a kosher diet in Florida's prisons does not support

finding that the claim is moot.

Finally, when this case was initiated, Mr. Watkins was housed at Wakulla

Correctional Institution.  He has now been transferred to Gulf Correctional Institution.

During his incarceration, Mr. Watkins has been held at eight different institutions.  Doc.

77, Ex. B (doc. 77-2).  He will likely be transferred again and there is no assurance that

Mr. Watkins will be given the CFO at the next institution.  The evidence submitted here

demonstrate that as of October 9, 2014, the CFO had been offered to approximately

half of the inmate population.  Doc. 77, Ex. H at 3 (doc. 77-8).  The evidence reveals

that Gulf Correctional Institution "began serving the CFO meals on January 9, 2015."

*Id.* However, it is unknown whether and when the CFO will be offered in all institutions.

Accordingly, this claim is not moot.

Mr. Watkins has been faced with either eating foods that violate his religious

beliefs or go hungry.  Faced with those options, he has been substantially burdened in

the exercise of his religious faith.  The burden, thus, shifts to Secretary Jones to show

the Department's "policy of not providing kosher meals is in furtherance of a compelling

governmental interest and is the least restrictive means of furthering that interest."

Rich, 716 F.3d at 532.

The Secretary maintains that consideration of costs is a compelling interest and that offering the CFO is too costly.  Doc. 76 at 29-33.  It is argued that there is no less restrictive alternative than not providing a kosher menu option.  *Id.* at 33-34.  The Secretary contends that deference must be given to its policy decisions concerning prison management and "apportioning limited budgetary resources among important obligations of prison administration, rehabilitation, and reform."  *Id.* at 35-36.  Yet deference does not mean unquestioning acceptance of the Department's position, nor does it "justify the abdication of the [Court's] responsibility . . . to apply RLUIPA's rigorous standard."  Holt, 135 S.Ct. at 864.  Deference also does not require accepting policies based on "speculation, exaggerated fears, or post-hoc rationalizations . . . ." Lawson v. Singletary, 85 F.3d 502, 509 (11th Cir. 1996) (quotation omitted) (discussing the Religious Freedom Restoration Act, predecessor to RLUIPA) (quoted in Rich, 716 F.3d at 533)).  " 'The least-restrictive-means standard is exceptionally demanding,' and it requires the government to 'sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y].' "  Hobby Lobby, 134 S.Ct. at 2780 (quoted in Holt, 135 S. Ct. at 864).  The Secretary has not carried the burden.

The costs provided are exaggerated, pointing to the necessity of purchasing microwaves and heated cabinets.  *See* doc. 77, Ex. K.  Those costs appear to be irrelevant to the CFO now provided which serves cold food only.  *See* doc. 84 at 7.  Moreover, the Secretary has presented an all-or-nothing approach in this case, and has not explained "why Florida's prisons are so different from the penal institutions that now provide kosher meals such that the plans adopted by those other institutions would not

work in Florida."  Rich, 716 F.3d at 534.  The cost of an additional 53 cents for a kosher

diet above the $3.00 cost for a therapeutic diet is a minimal impact on a budget

appropriation of $2,299,631,064.00.  Doc. 77, Ex. J.  "Although cost reduction, as a

general matter, is unquestionably a compelling interest of TDCJ, we are skeptical that

saving less than .05% of the food budget constitutes a compelling interest."

Moussazadeh v. Texas Dep't of Criminal Justice, 703 F.3d 781, 795 (5th Cir. 2012), as

corrected (Feb. 20, 2013); see also Sec'y, Florida Dep't of Corr., No. 12-22958-CIV,

2013 WL 6697786, at *11 (concluding that "[t]he costs initially identified by Defendants

in this litigation are not of a compelling magnitude.").  The Secretary's motion for

summary judgment as to the request for Halal meals under the RLUIPA should be

denied.  It is further recommended that the summary judgment motion filed by

Mr. Watkins be granted as to this claim.

## C.    Halal Food During Eids

Mr. Watkins alleged that the denial of Halal food for Eid celebrations violates his

rights under the First and Fourteenth Amendments, and also constitutes a RLUIPA

violation.  Doc. 29 at 9.  To be clear, the claim alleged was that the Department should

either serve Halal food for those celebrations, or have "such food catered by an

approved D.O.C. vender."  Id.  Mr. Watkins also claimed that Jewish inmates were

allowed to receive a forty-pound box of Passover food, but the Department denied his

request to have Halal food for Eid celebrations.  Id.

There has been no evidence submitted which reveals the Department has

supplied food for any religious festivals or celebrations, including Passover.  Rather, the

evidence shows that the Department permits food to be donated within certain

parameters.  The evidence here refutes the Fourteenth Amendment equal protection claim because other religious groups have not been treated more favorably than Mr. Watson.

Furthermore, there is no First Amendment violation because both the Eid ul Fitr and Eid ul Adha are recognized Muslim holidays and may be celebrated with a meal.  A meal will be arranged by the Chaplain and the Food Service Department, including the service of guests.  The Department does not provide "does not provide special foods" for these religious celebrations, but it does permit the donation of such food.  At the present time, there is no evidence of any known organization willing to donate food for these Muslim feasts.  Because Departmental rules have not infringed upon Mr. Watkin's First Amendment rights to celebrate Eid ul Adha or Eid ul Fitr, summary judgment should be granted in the Secretary's favor on this claim.

As for the RLUIPA claim, the Secretary contends the claim is moot because Mr. Watkins only requested Halal food "for holy days at Wakulla CI, not at Gulf CI." Doc. 76 at 36.  The evidence supports that argument.  It is also true that requests made at Gulf C.I. are unexhausted because they came after case initiation.  Moreover, to the degree Mr. Watkins is now able to receive kosher food, this claim also appears to be moot.  Mr. Watkins has not demonstrated that any particular food must be served at the Eid celebrations.  Thus, it appears that being served Halal or kosher food will suffice. To the degree Mr. Watkins contends that food may be provided from an outside source, he has not presented evidence to show that any group or organization has come forward to donate or purchase such food for Muslim feasts.  Accordingly, summary judgment should be granted in favor of Secretary Jones on this claim as well.

**D.    Jumu'ah Prayer**

The remaining claim concerns the Friday Jumu'ah service.  For many years, one Friday service has been provided for all Muslim inmates, inclusive with Nation of Islam adherents.  Mr. Watkins seeks to have separate space provided so that Sunni Muslims are separated from Nation of Islams followers due to conflicting beliefs.  As an equal protection claim, this claim is insufficient.  The evidence reveals that there are inclusive Christian services for related faith groups just as there is one inclusive Jumu'ah service.  Mr. Watkins has not been treated differently as the Department of Corrections has combined all similar faiths for one inclusive service.  Summary judgment should be granted in favor of Secretary Jones on the equal protection claim.

As for the First Amendment nature of this claim, it is also insufficient.  The First Amendment, made applicable to the States through the Fourteenth Amendment, "safeguards the free exercise of [one's] chosen form of religion." Cantwell v. State of Connecticut, 310 U.S. 296, 303, 60 S. Ct. 900, 903, 84 L. Ed. 1213 (1940).  While prisoners retain First Amendment rights, including the First Amendment right of free exercise of religion, *see* Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (*per curiam*), prison regulations or policies "alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights."  O'Lone v. Estate of Shabazz, 482 U.S. 340, 349, 107 S. Ct. 2400, 2404, 96 L. Ed. 2d 282 (1987) (holding that the Turner v. Safley standard of review is applicable to claims that an inmate's free exercise rights have been violated).

The Turner standard of review utilized in O'Lone requires the Court to uphold

prison regulations if they are "reasonably related to legitimate penological interests."

O'Lone, 482 U.S. at 350; Turner v. Safley, 482 U.S. 78, 107 S. Ct. 2254, 96 L. Ed. 2d

64 (1987).  Accordingly, "[a] prison regulation, even though it infringes the inmate's

constitutional rights, is an actionable constitutional violation only if the regulation is

unreasonable."  Hakim v. Hicks, 223 F.3d 1244, 1247 (11th Cir. 2000), *cert. denied*, 532

U.S. 932 (2001) (holding that the Department of Corrections policy to not permit a

"dual-name" on inmate identification card violated inmate's right to the free exercise of

religion by denying him his Muslim identity and was unreasonable under Turner).

The Turner standard is met in this case.  There is "valid, rational connection" in

the management of facility space and available staff to justify combining services for

related faiths.  The goal of conserving those limited resources is neither remote,

arbitrary, or irrational.  Muslim inmates are still able to exercise the right of religious

expression, but must do so with other persons who, while sharing general religious

believes, also have differing opinions.  Indeed, from the dawn of time, communal

spiritual worship has frequently involved bringing together people with common or

general ideals, but with different views on specific points.  Very rarely will a group of

people agree on every aspect of faith, theology, and the practical application of such

beliefs.  Tolerance is required between faith groups that meet within the confines of a

prison's walls just as it is required outside of those walls.  There is no demonstration on

this record that having to worship among Nation of Islam followers so detracts from his

ability to worship that these faith groups must be physically separated.  There have

been disagreements, but no physical altercations.  There also appears to be more in common than there are differences.

Accordingly, considering the remaining Turner factors, if Mr. Watkins' request were granted, it would have a negative impact on institutional space, staff, and would certainly lead to all other religious faith groups demanding their own separate space for worship.  There are also alternatives readily available for exercising religious faith specific to the Sunni Muslim beliefs as Mr. Watkins is permitted to have religious literature, engage in "religious correspondence," and meet with spiritual advisors. Summary judgment should be granted in favor of Secretary Jones on this First Amendment claim.

Finally, Mr. Watkins included this as the basis for a RLUIPA claim as well.  It is incumbent upon him to show that the Department's inclusive worship policy has substantially burdened his exercise of religion.  That showing has not been made.  It is evident that Mr. Watkins wants separation due to differences of opinion, but he has not explained the substantial burden he experiences in having one combined Jumu'ah service.  Therefore, summary judgment should also be granted in favor of Secretary Jones on this claim.

**RECOMMENDATION**

It is respectfully **RECOMMENDED** that the motion for summary judgment filed by Secretary Julie Jones, doc. 76, be **GRANTED in part** and **DENIED in part**.  Judgment should be granted in favor of the Secretary on all First and Fourteenth Amendment claims, as well as the RLUIPA claim concerning separate space for Jumu'ah prayer services.  The claim for Halal food at Eid celebrations should be dismissed as moot.

Judgment should be granted in favor of Mr. Watkins on the RLUIPA claim concerning

the request to grow a ¼-inch beard and to be served Halal or kosher food.

**IN CHAMBERS** at Tallahassee, Florida, on August 28, 2015.


 S/    Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**



## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**